MOGEEB WEISS (SBN: 236087)
WEISS LAW, PC
1151 Harbor Bay Parkway, Suite 134
Alameda, CA 94502
Telephone: (510) 581-1857
Facsimile:  (650) 581-9493
mweiss@wslawgroup.com

Attorneys for Plaintiff
ST. FRANCIS ASSISI,
a California Non-Profit Mutual Benefit Corporation

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ST. FRANCIS ASSISI, a California Non-Profit Mutual Benefit Corporation<br><br>         Plaintiff<br>    v.<br><br>KUWAIT FINANCE HOUSE; KUVEYT-TURK PARTICIPATION BANK INC., HAJJAJ AL AJMI; and DOES 1 to 200<br><br>         Defendants | **Case No.:**<br><br>**COMPLAINT FOR DAMAGES**<br><br><br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

-1-

COMPLAINT

For its complaint, Plaintiff St. Francis Assisi ("SFA") by and through its attorneys WEISS LAW, PC avers as follows:

## NATURE OF THE ACTION

1. This is a complaint for damages and equitable relief arising out of the conduct of the Kuwait Finance House ("KFH") a Kuwait based bank, and Kuveyt-Turk Participation Bank, Inc., ("KTPB") a Turkey based financial institution owned by KFH. KFH and KTPB continuously, knowingly, directly, and wilfully provide, distribute, and administer the distribution of financial benefits, money and financial services to the terrorist organization known as the Islamic State Iraq Syria ("ISIS) which have killed, injured, and maimed civilians and continue to do so even inside the United States. Specifically, ISIS targeted the murder of Assyrian Christians in Iraq and Syria and forced them into refugee camps.

2. By the acts stated herein, KFH and KTPB aided, abetted, and conspired to commit acts of international terrorism, resulting in the killing, attempted killing, and maiming of SFA members. SFA members were injured in their person and property and displaced into refugee camps by the acts stated herein. The acts of KFH and KTPB are in direct violation of the Anti- Terrorism Act 18 U.S.C. §§ 2339A, 2339B and 2339C.

## THE PARTIES

3. SFA is a non-profit mutual benefit corporation organized under the laws of the State of California, with its principal place of business in Alameda California. SFA members are Assyrian Christians who own property in Iraq and Syria and who have been systematically subjected to unprovoked killings and displacement into refugee camps by the terrorist organization Islamic State of Iraq and Syria ("ISIS".)

4. Defendant Kuwait Finance House ("KFH") is a bank established in the State of Kuwait in 1977. Stocks of KFH are publicly traded in the Kuwait Stock Exchange. KFH operates in Turkey and several other Islamic States.

5. Defendant Kuveyt-Turk Participation Bank, Inc., ("KTPB") is a private financial institution formed in 1989. 62% of KTPB is owned by KFH. KFH directs and manages the policy and organization of KFH.

6. Hajjaj al-'Ajmi is a Kuwaiti individual who actively fundraises for Islamic State in Iraq and Syria.

## VENUE AND JURISDICTION

7. This Court has jurisdiction over this action under 28 U.S.C §2334(a)

## GENERAL ALLEGATIONS

### I.  Statement of Facts

8. In August 2014, the US government and the UN designated Hajjaj Fahd al-Ajmi as a terrorist financier for al-Qaida, stating:

> **"Hajjaj al-'Ajmi serves as a funnel for financial donations to [al-Nusra Front] facilitators in Syria, traveling regularly from Kuwait to Syria to engage in financial activity on behalf of [al-Nusra Front] and deliver money to the group. He agreed to provide financial support to [al-Nusra Front] in exchange for installing Kuwaitis in [al-Nusra Front] leadership positions. In early January 2014, he offered [al-Nusra Front] money to lead a battlefield campaign in Homs, Syria."**

9. Prior to the designation, Hajjaj al-Ajmi's fundraising activities for al-Qaida in Syria were displayed on Twitter accounts operated by the terrorist organization. For example, in August 2013, an al-Nusra Front media office directed supporters to send donations through Hajjaj al-Ajmi for operations on the Syrian coast. Donors were instructed to contact Hajjaj al-Ajmi directly through his Twitter account.

10. In June 2012, approximately two years prior to his designation as an al-Qaida fundraiser, Hajjaj al-Ajmi established a fundraising organization called the "Popular Commission in Support of the Syrian Revolution". The Popular Commission solicited funds through its own Twitter account and Hajjaj al-Ajmi's personal Twitter account for the purchase of weapons and

-3-

COMPLAINT

artillery in support of jihadist groups in Syria. By mid- 2013, the Popular Commission "raised hundreds of thousands of dollars to finance Syrian rebel groups." In mid-2013, approximately one year prior to his designation as an al- Qaida fundraiser, Hajjaj al-Ajmi helped launch the "Mobilization of the People of Qatar Campaign for the Levant" (Fazat Ahl Qatar Lel Sham) to raise funds for jihadist fighters in Syria. Solicitations for this campaign included contact information for his fundraising co-facilitators who also used their social media accounts to assist Hajjaj al-Ajmi's fundraising initiatives.

11. Hajjaj al-Ajmi instructed followers to make their donations to an account in KTPB. KTPB is known as Kuveyt Turk Katilim Bankasi A.S., located in Istanbul, Turkey. The bank account is under the name of Islami Sam Heyeti Dernegi customer number 8695311 and account number TR960020500000869531100123.

12. In a YouTube video, Hajjaj al-Ajmi urged his followers to make donations to the bank account in KTPB. The video can be viewed at https://www.youtube.com/watch?v=Qa5TRTSU400

13. Hajaj bin Fahd al-Ajmi used several Charities to fundraise for ISIS. They are: al-Haiah al-Sh'abiyah -D'am al-Thawrah al-Suriyah (The Popular Commission to Support the Syrian Revolution).

14. Hajjaj bin Fahd al-Ajmi's partner in running the charity is Umma Party member Irshid al-Harji.

15. The charity remains operational under al-Hajri's leadership, but has changed its name to al-Haiah Zakat al-Sh'abiyah (The Popular Charity Commission). Despite the name change, the charity is using the same logo, Twitter account, and directs donors to the same address in Kuwait's Aqilah neighborhood as prior to August 2014. The organization now focuses on distributing relief in Syria, and recently delivered supplies to Syrians in Idlib and Lattakia Provinces in cooperation with the Umma Party's Istanbul office.

16. Hajaj bin Fahd al-Ajmi has a Social Media rating of 100, which is the highest possible score indicating confirmed linked with networks of terrorism.

17. On 6 August 2014 the United States Treasury Department officially designated Hajjaj bin Fahd al-Ajmi as a supporter of terrorists in Syria and Iraq. This was 9 days prior to the United Nations Designation. The official U.S. Treasury Designation is as follows:

> **The U.S. Department of the Treasury today imposed sanctions on three key terrorist financiers under Executive Order (E.O.) 13224. Two of the individuals designated today, Shafi Sultan Mohammed al-Ajmi and Hajjaj Fahd Hajjaj Muhammad Sahib al-'Ajmi, are Kuwait-based and support the Syria-based, al-Qaida-linked terrorist organization Al Nusrah Front (ANF); one individual, 'Abd al-Rahman Khalaf 'Ubayd Juday' al-'Anizi, is a financier and facilitator of the Islamic State of Iraq and the Levant (ISIL), previously known as al-Qaida in Iraq (AQI). Each has been designated as a Specially Designated Global Terrorist (SDGT)**

18. Even after the arrest of Hajjaj bin Fahd al-Ajmi under an Interpol Notice, KTPB continued to be the recipient of money by the terrorist network ISIS. Current operation includes using a phone application to facilitate the raising of funds.

19. On 20 June 2015, an Islamic Front account re-tweeted an organization (@Mumder_) with links to extremist accounts. The extremist accounts found within this network identify themselves with ISIS and post their tweets in the Turkish language. The tweet depicted on 20 June 2015 mentioned KTPB bank account account numbers.

20. Mumder is a new Turkish organization created on May 2015 and alleges that it operates its fundraising efforts for Muslim prisoners through the KTPB bank accounts and is linked to Turkish speaking members of Jabhat Al-Nusra.

21. Mumder has posted its KTPB accounts to its social media pages. They have an account for different currencies including Turkish Lira, USD, and the Euro.

22. A Turkish speaking Islamic Front account mentioned KTPB in a post on 20 June 2015. This social media account re-tweeted an association for Muslim prisoners located in Istanbul, Turkey. Its followers include ISIS.

23. To successfully plan, fund, and carry out the killings of members of SFA, ISIS relies upon an open, notorious, well known, and formalized system of terrorist financing which incentivizes and incites the killings and displacement of the Assyrian Christians.

24. In hearings in 1990 regarding the then-pending Antiterrorism Act of 1990, Joseph A. Morris, a former Department of Justice attorney and former General Counsel of the United States Information Agency, testified:

> **International terrorism has become, in many respects, an industry. It rests on a foundation of money. Money is often more important to the masters of terrorism than are people. That they care little for their victims goes without saying; but it is instructive of many terrorist organizations appear to care little for their own operatives, treating them as fungible and dependable.**

25. KTPB/KFH collected, transmitted, disbursed and provided the financial resources that allowed ISIS to flourish and to engage in a campaign of terror, genocide, and crimes against humanity in an attempt to eradicate the Assyrian Christians. KTPB/KFH knowingly, intentionally, directly and indirectly, aided, abetted, facilitated, and recklessly disregarded the commission of these attacks by ISIS.

26. In addition to maintaining accounts at its bank for well-known terrorist front groups and individuals who supported their causes, KTPB/KFH empowered ISIS by providing instructions to the general public on how to qualify and collect money, and by serving as the "paymaster" to the ISIS. With the aid of public and private donations deposited in numerous accounts established at financial institutions in the Middle East -primary among them the KTPB - and opened for the explicit purpose of providing funds to ISIS to murder and maim the Assyrian Christians ISIS successfully displaced and murdered hundreds and hundreds of Assyrian Christians.

## COUNT ONE

### 18 U.S.C. § 2331 *et seq.* ("THE ANTITERRORISM ACT")

27. SFA incorporates herein by reference the averments contained in all preceding

-6-

COMPLAINT

paragraphs.

28. The Defendants herein engaged in acts of international terrorism; activities that involve violent acts dangerous to human life that are in violation of the criminal law of the United States and appear to be intended to intimidate or coerce a civilian population; to influence policy of a government by intimidating or coercion; or to affect the conduct of a government by assassination.

29. Defendant, through its acts and omissions, committed, furthered, supported, encouraged and made possible acts of international terrorism, within the meaning 18 U.S.C. §2331, in that it:

(a) violated Section 2339A by providing material support or resources, including without limitation currency and financial services, knowing or intending that they were to be used in preparation for, or in carrying out certain prohibited criminal acts, including those with respect to killing, maiming, or injuring persons in a foreign country and killing a United States national outside the United States;

(b) violated Section 2339B(a)(1) by knowingly providing material support or resources, including without limitation currency and financial services, to a foreign terrorist organization, specifically designated as such by the Secretary of State;

(c) violated Section 2339B(a)(2) by becoming aware that they had possession of or control over, funds in which a foreign terrorist organization, or its agent, had an interest, and they failed to (i) retain possession of, or maintain control over, such funds or (ii) report to the Secretary of the Treasury the existence of such funds; and

(d) violated Section 2339C by, directly and indirectly, collecting funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such

act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act.

30. This activity transcends international boundaries in terms of the means by which they are accomplished, the persons they appear to intend to intimidate or coerce, or in terms of the locale in which the perpetrators operate or seek asylum. 18 U.S.C. 2331.

31. Nationals of the United States injured in his or her person, property or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefore in any appropriate district court of the United States and shall recover threefold the damages they sustain and the costs of suit, including attorney's fees. 18 U.S.C. 2333.

32. As set forth above, Defendant proximately caused the deaths and injuries to the members of the SFA described herein through and by reason of acts of international terrorism that were encouraged, enticed, rewarded, carried out and made possible as a result of funds Defendant collected and disbursed. As a result, the acts of international terrorism described herein were reasonably foreseeable consequences of Defendant's collecting and disbursing such funds.

33. As set forth above, Defendant committed, conspired, or otherwise engaged in or provided material support for the acts of international terrorism, including but not limited to providing material support and/or aiding and abetting assistance to ISIS and international terrorism. This material support and/or aiding and abetting of acts of international terrorism allowed ISIS to carry out the terrorist attacks described herein.

34. As a result of Defendant's acts of international terrorism, including but not limited to financial sponsorship, logistical, and other material support, SFA suffered damages as set forth herein.

**COUNT TWO**

**AIDING AND ABETTING VIOLATIONS OF THE ANTITERRORISM ACT**

35. SFA incorporates herein by reference the averments contained in all preceding

-8-

COMPLAINT

paragraphs.

36. ISIS engaged in acts of international terrorism, as defined in 18 U.S.C. §2331, in violation of 18 U.S.C. §2333. The acts of international terrorism committed by ISIS, as described herein, caused death and injury to the United States Citizen Plaintiffs and their decedents.

37. Defendant aided and abetted these acts of international terrorism, in that defendant collected and disbursed funds knowing that such funds would be used to support, encourage, entice, reward, carry-out and make possible terrorist activities against the Assyrian Christians. Defendant knew the goals of ISIS and other international terrorist organizations and knowingly advanced those goals. This aiding and abetting of acts of international terrorism allowed ISIS to carry out the murder of Assyrian Christians and the mass murder in the United States.

**WHEREFORE,** SFA demands judgment in their favor against Defendants and demand an amount to be determined by a jury, not less than the statutory amount and demand treble damages pursuant to statute, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again aiding and abetting the commission of such terrorist acts again.

## COUNT THREE

### FINANCING OF TERRORISM IN VIOLATION OF THE LAW OF NATIONS

38. SFA incorporates herein by reference the averments contained in all preceding paragraphs.

39. The financing of the murderous attacks committed by ISIS against SFA members and the unarmed members of the Assyrian Christians constitute a crime in violation of the law of the nation.

40. The crime of terrorist financing rests on a clear and definite norm of international

law which is universally accepted by the civilized world. The International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GAOR, 54th Sess., 76ili mtg., Supp. No. 49, U.N. Doc. A/Res/53/108 (1999) (In force Apr. 2002) ("Convention") is declaratory of existing international law. It has been signed by 132 states, and, as of December 8 2004, was Ill force among 117 states. See http://untreaty.un.org/ENGLISH/Status/Chapter _xviii/treatyl 1.asp. The Convention condemns the funding of terrorism and requires that the provision or collection of funds for terrorist offenses be criminalized. The United States ratified this Convention on June 26, 2002.

41. The Convention follows the precedents set by numerous other sources of international law that reflect the universal condemnation of terrorist financing.

42. First, the Convention defines offenses by incorporating eleven existing anti-terrorism conventions. Thus, a Convention offense includes providing or collecting funds for any act falling within the International Convention for the Suppression of Terrorist Bombings, adopted by the General Assembly of the United Nations Jan. 12, 1998, G.A. Res. 164, U.N. GAOR 52nd Sess., U.N. Doc. A/RES/52/164 (1998), 37 I.L.M. 249 (1998) (In force May 23, 2001) ("Bombing Convention"), which itself has been ratified by 123 nations. The United States ratified the Bombing Convention on June 26, 2002.

43. Convention offenses also encompass providing or collecting funds for "any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in hostilities in a situation of armed conflict, when the purpose of the act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

44. Second, the Convention supplements existing international authority in the form of U.N. Security Council Resolutions which reflect the international community's collective denouncement of terrorist financing:

- Resolution 1267 (1999) of October 15, 1999 on the freezing of the funds and other financial resources of the Taliban. Designated Osama bin Laden and associates as terrorists and established a sanctions regime to cover individuals and entities associated with Al-Qaida, Osama bin Laden and/or the Taliban wherever located.

- Resolution 1269 (1999) of October 19, 1999 calling upon states to take steps to deny those who finance terrorist acts safe haven.

- Resolution 1333 (2000) of December 19, 2000 on the freezing of the funds and other resources of Usama bin Laden and the Al-Qaida organization.

- Resolution 1363 (2001) of July 30, 2001 on the establishment of a mechanism to monitor the implementation of measures imposed by Resolutions 1267 (1999) and 1333 (2000).

- Resolution 1373 (2001) of September 28, 2001 on threats to international peace and security caused by terrorist acts, and mandating the formation of the Counter-Terrorism Committee.

- Resolution 1377 (2001) of November 12, 2001 calling upon states to implement fully Resolution 1373 (2001).

- Resolution 1390 (2002) of January 16, 2002 effectively merging the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

- Resolution 1455 (2003) of January 17, 2003 on measures to improve the implementation of the freezing measures of Resolutions 1267 (1999), 1333 (2000), and 1390 (2002).

- Resolution 1456 (2003) of January 29, 2003 reaffirming that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened"; stating that states must "bring to justice those who finance...terrorist acts"; and urging states to become parties to the 1999 Terrorism Financing Convention; calling on Counter-Terrorism Committee to intensify efforts to implement Resolution 1373 (2001).

- Resolution 1526 (2004) of January 30, 2004 calling upon states to implement fully Resolution 1373 (2001), and measures to improve the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

- Resolution 1535 (2004) of March 26, 2004 calling upon states to implement fully Resolution 1373 (2001).

- Congressional Resolution 75, dated 15 March 2016 deeming acts of war crimes and genocide against Assyrian Christians.

45. U.N. Security Council Resolution 1373 was unanimously adopted under Chapter VII of the U.N. Charter. Under Article 25, decisions taken by the Security Council under Chapter VII of the Charter are legally binding on all members.

46. Resolution 1373 is unequivocally directed at the prevention, prosecution, and punishment of the financing of terrorism, and characterizes acts of terrorism as threats to international peace and security. By characterizing acts of terrorism as threats to international peace and security, the Security Council is entitled to take the collective measures (or "sanctions") envisioned by Chapter VII of the United Nations Charter. The measures that the Council decides to take in these circumstances are mandatory for all the members of the United Nations by virtue of Articles 25 and 48 of the Charter.

47. Under Resolution 1373, "all States shall...prevent and suppress the financing of terrorist acts" and "criminalize the willful provision or collection, by any means, directly or indirectly, of funds by their nationals or in their territories with the intention that the funds should be used, or in the knowledge that they are to be used, in order to carry out terrorist attacks." States are equally bound to "[e]sure that any person who participates in the financing" of terrorism "is brought to justice." Resolution 1373's prohibition against "acts, methods, and practices of terrorism" which are "contrary to the purposes and principles of the United Nations" - including knowingly financing, planning and inciting terrorist acts - is declaratory of the fact that terrorist financing is contrary to existing Treaty obligations of member states as expressed in the purposes and principles of the U.N. Charter, which all member states are obliged to honor.

48. World condemnation of terrorist financing is equally reflected in various regional conventions, which prohibit the financing of terrorist acts. See Annex to Resolution No.: 59//26P; 1999 Convention of the Organization of the Islamic Conference on Combating International Terrorism, Art. 3; 1999 OAU Convention on the Prevention and Combating of Terrorism {Algiers, July 14, 1999), Art. 3; 1998 Arab Convention for the Suppression of Terrorism

(Cairo, April 1998), Art. 3.)

49. Terrorist financing is likewise defined with specificity sufficiently comparable to international law violations that were familiar when the ATCA was enacted.

50. Consistent with its condemnation of terrorism financing, the world community has also joined in defining who can be held liable. The Convention explicitly provides that liability for terrorist financing reaches those that directly or indirectly provide or collect funds with the intention or knowledge that the funds will be used to carry out a defined terrorist offense, regardless of whether the funds were actually used. Specifically, the Convention reaches every accomplice and every person who organizes or directs others in the terrorist financing effort.

51. Furthermore, legal entities may be held civilly liable for the offenses set out in the Convention. This comports with the general international consensus embodied in the Bombing Convention, which also reaches all persons who "participate as an accomplice" in a terrorist bombing or "organizes others to commit them or in any other way contributes to their commission."

52. KTPB/KFH aided and abetted, intentionally facilitated, and recklessly disregarded a violation of international law, to wit, terrorist financing, by directly or indirectly providing funds ISIS with the intention or knowledge that those funds would be used to carry out an offense as defined by the Convention, the Bombing Convention and international law.

53. KTPB/KFH regularly accepted hundreds of thousand of dollars in deposits from state sponsored charities, official state donations, and private contributions, with actual knowledge and awareness that these same funds were raised and deposited for the sole purpose of supporting ISIS murderers; transferred funds from those accounts to other participating banks; and disbursed those funds to, among others, ISIS genocidal murderers who systematically murdered and displaced Assyrian Christians.

54. At all times, KTPB/KFH knew that its receipt, transfer, and disbursement of funds were being paid to ISIS murderous attacks against Assyrian Christians and other civilians.

55. KTPB/KFH conduct further provided organizational incentives to ISIS to continue to plan, and operate the murder of Assyrian Christians.

56. In the alternative, KTPB/KFH aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law, to wit, terrorist financing, by directly or indirectly providing funds to ISIS with the intention or knowledge that those funds would be used to carry out an offense as defined by the Convention and international law.

57. SFA members suffered death or serious physical and/or mental injuries and displacement to refugee camps as a proximate result of KTPB/KFH conduct.

WHEREFORE, SFA demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again engaging in the financing of terrorism in violation of the law of nations.

## COUNT FOUR

**AIDING AND ABETTING, COMPLICITY, PARTICIPATING IN A JOINT VENTURE, AND/OR RECKLESS DISREGARD TO ENGAGE IN ACTS OF GENOCIDE IN VIOLATION OF THE LAW OF NATIONS**

58. SFA incorporates herein by reference the averments contained in all preceding paragraphs.

59. KTPB/KFH acted in the face of an unjustifiably high risk of harm to SFA because it had actual knowledge of the substantial risk posed to members of the SFA which it disregarded to detriment of the Assyrian Christians. KTPB/KFH was well aware of the ISIS goal against the Assyrian Christians yet they continued to provide funds

60. KTPB/KFH aided and abetted, intentionally facilitated, was complicit in, and/or recklessly disregarded the planning, preparation or execution of genocide against the Assyrian Christians by providing organized and systematic financial and other practical assistance,

-14-

COMPLAINT

encouragement or moral support which had a substantial effect on the perpetration of genocide, with knowledge that its actions would assist ISIS.

WHEREFORE, SFA demands judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, not less than the statutory amount for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again contributing to facilitating or aiding and abetting a campaign of genocide against the Assyrian Christians in violation of the law of nations.

## COUNT FIVE

**AIDING AND ABETTING, INTENTIONALLY FACILITATING, AND/OR RECKLESSLY DISREGARDING CRIMES AGAINST HUMANITY IN VIOLATION OF INTERNATIONAL LAW**

61. SFA incorporates herein by reference the averments contained in all preceding paragraphs.

62. The genocide committed by ISIS against Plaintiffs and the unarmed Assyrian Christians constitute a crime against humanity in violation of the law of nations.

63. KTPB/KFH knowingly, intentionally and directly aided and abetted, intentionally facilitated, and/or recklessly disregarded crimes against humanity in violation of the law of nations.

64. KTPB/KFH helped to develop the financial system that provided monetary incentives to ISIS to engage in crimes against humanity.

65. KTPB/KFH regularly accepted hundreds of dollars in deposits from state-sponsored charities, official state donations, and private contributions with actual knowledge and awareness that these same funds were raised and deposited for the sole purpose of supporting ISIS murder; transferred funds from those accounts to other participating banks; and disbursed those funds to, among others, ISIS organization to commit crimes against humanity against SFA members.

66. At all times, KTPB/KFH knew that its receipt, transfer, and disbursement of funds were being paid to ISIS and that these same organization carried out indiscriminate murder against Plaintiffs and other US Nationals.

67. KTPB/KFH aided and abetted, intentionally facilitated and/or recklessly disregarded the planning, preparation or execution of the crimes against humanity by providing organized and systematic financial and other practical assistance, encouragement or moral support which had a substantial effect on the perpetration of crimes against humanity, with knowledge that their actions would assist ISIS in the commission of crimes against humanity.

68. SFA members suffered death or serious physical and/or mental injuries as a proximate result of KTPB/KFH actions.

WHEREFORE, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury, not less than the statutory amount, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again engaging in crimes against humanity against the people of the State of Israel in violation of the law of nations.

## COUNT SIX

### ASSISTING IN THE INTENTIONAL INJURY OF OTHERS BY A THIRD PARTY

69. SFA incorporates herein by reference the averments contained in all preceding paragraphs.

70. Defendant knew, or should have known, that the funds deposited in the specific accounts established and maintained by it, and discussed herein throughout, were being used to support, encourage, entice and make possible the murder of Assyrian Christians.

71. Through both its actions and its inactions, Defendant allowed its facilities to be used ISIS and their supporters in order to support, encourage, entice and make possible the

intentional and foreseeable acts of those groups including, but not limited to, its campaign of genocide, war crimes, crimes against humanity, and other heinous acts of international terrorism described herein.

72. Defendants' actions and inactions served to create an unreasonable risk of harm to others including but not limited to the SFA members through the foreseeable acts of ISIS and its supporters.

73. At the time of its conduct, Defendants realized or should have realized the likelihood that the accounts were being used in such a way, and that ISIS and other terrorist organizations, as well as their supporters, might avail themselves of the opportunity to commit such a tort or crime.

74. As a result of the foregoing Plaintiff has been damaged in an amount not less than the statutory amount

WHEREFORE, Plaintiff demands judgment as follows:

1. Against Defendant, for compensatory damages in favor of each member of the Plaintiff in an amount to be determined at trial but not less than $75,000.

2. Against Defendant in favor of all Plaintiffs who are U.S. nationals for treble damages pursuant to 18 U.S.C. § 2333.

3. Against Defendant in favor of all Plaintiffs who are not U.S. nationals for punitive damages in an amount sufficient to prevent the Defendant from ever again supporting, encouraging, enticing, rewarding, carrying-out and making possible terrorist or similar acts.

4. Against Defendant in favor of Plaintiffs for any and all costs incurred in connection with the prosecution of this action, including reasonable attorney's fees.

5. Such other and further relief as justice requires.

## COUNT SEVEN

## RECKLESS DISREGARD

75. SFA incorporates herein by reference the averments contained in all preceding

paragraphs.

76. Defendant knew, or should have known, that the funds deposited in the specific accounts established and maintained by it, and discussed herein throughout, were used to support, encourage, entice and make possible the suicide bombings and other murderous attacks described herein. As a result, Defendants were aware, or should have been aware, of a risk so great that it was highly probable that serious harm and/or death could result from their acts in collecting and distributing such funds.

77. Defendant recklessly disregarded this known and substantial risk thereby setting in motion the murderous attacks that were foreseeable to Defendants and which were the direct and proximate cause of the injury and/or death of Plaintiff and/or their decedents.

78. As a result of the foregoing Plaintiff have been damaged in an amount not less than the statutory amount of $75,000.

WHEREFORE, Plaintiffs demand judgment as follows:

1. Against Defendants, for compensatory damages in favor of each of the Plaintiffs in an amount to be determined at trial but not less than $75,000.

2. Against Defendant in favor of all Plaintiffs who are U.S. nationals for treble damages pursuant to 18 U.S.C. § 2333.

3. Against Defendants in favor of all Plaintiffs who are not U.S. nationals for punitive damages in an amount sufficient to prevent the Defendant from ever again supporting, encouraging, enticing, rewarding, financing, carrying-out and making possible terrorist or similar acts.

4. Against Defendants in favor of Plaintiffs for any and all costs incurred in connection with the prosecution of this action, including reasonable attorney's fees.

5. Such other and further relief as justice requires.

//

# PRAYER

**WHEREFORE**, SFA prays for judgment as follows:

1. For compensatory and general damages, according to proof;
2. For special damages, according to proof;
3. For Punitive damages in an amount appropriate to punish Defendant and deter others from engaging in similar misconduct;
4. For restitution and disgorgement, according to proof;
5. For prejudgment interest at the maximum legal rate;
6. For costs of the proceedings herein;
7. For reasonable attorney's fees;
8. For all such other and further relief as the Court deems just.

# DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 3-6, AKCC hereby demands a jury trial on all issues so triable.

Dated: June 13, 2016                               WEISS LAW, PC

By: _____
Mogeeb Weiss Attorneys for Plaintiff
ST. FRANCIS ASSISI a California Non-Profit Mutual Benefit Corporation